119-2428 WC Craig Markiewicz Appellant versus the Workers' Compensation Commission McHugh Construction Appellee. Okay uh Mr. Berry no excuse me Mr. Popelka you may proceed. Thank you your honor um John Popelka on behalf of the appellant Craig Markiewicz. The relief that we are seeking is an award of permanent total disability benefits under the on September 21st of 2016. We are also seeking an award of temporary total disability benefits through the date of January 31st of 2013. We are seeking an award of maintenance benefits from February 1st of 2013 through September 20th of 2016. We're seeking an award of vocational expenses of two thousand dollars plus an award of penalties and attorney's fees as set forth in our brief. In order to get to the main issue of the permanent total disability benefits I believe we have to go through two main issues. The first issue is going to be the job offer that was made to the petitioner and the second is his participation in the truck driving school. So starting with the job offer Mr. Markiewicz underwent surgery by Dr. Grislow in June of 2012 and in September of 2012 he was released to medium duty and Dr. Grislow who said he's been treating iron workers for 23 years recommended that he undergo vocational rehabilitation stating that he's not able to return back to iron work. On October 5th of 2012 the employer made a light duty job offer and terminated his benefits. The light duty job offer was that stated on its face that he would not be assigned tasks he would only be assigned tasks consistent with Dr. Grislow's work restriction recommendations but the job title was iron worker. So the functional capacity evaluation report that my client went through on pages 820 and 821 of the record indicate that iron worker falls in the very heavy job capacity and his his capabilities fell at the medium level. So there was obviously a very large disparity there and in addition to that the functional capacity report said he could only stand for one hour durations. So we asked for a job description of what my client would be doing if he's going to go sit in a trailer that's one thing but if they actually expect him performing the job of an iron worker he's not capable of doing that. Eventually after a pre-trial which took place in December of 2012 arbitrator Thompson Smith recommended that they give us a job description stating that the petitioner has a right to know what he's agreeing to in her decision. That job description was finally provided on January 7th of 2013. It's contained in pages 984 to 991 of the record and the the job description states that my client would need to be on his feet all day which violates the face of the restrictions that he had. That he would be needing to bend four to six hours in an eight-hour day which also violates the restrictions from the FCE and that he would be installing rebar in walls in place standing on the rebar rungs of like the rungs of a ladder for three to four hours at a time. This was work on the Lower Wacker Reconstruction Project. So he'd be standing on the rebar tied off leaning back and and work walking up these rungs of a ladder of rebar doing his work. Mr. Rapelka in addition to the description you gave which I think we would assume is probably accurate I mean cutting to the chase didn't the arbitrator find and the commission adopted that the claimant did not fall into the ad-lib category. Grzyk himself or herself indicated that the defendant if he had a professional assistance it's more likely than not he would become employed. So what's your take on that? Well he wasn't offered that well he was offered professional assistance. He was offered a period of about a little under a year by the employer working at a or of going through mega driving school to become a class a driver. That was the that was what the respondent had chosen for him. After the vocational people got involved however it was quickly determined by both our expert and by the employer's expert that my client wasn't qualified to do that job because he wasn't physically capable of doing the class a job. So that's how I would initially answer that question that the employer did have provide him a professional responsibility but they didn't offer him something he was going to be able to do. The question is not whether the employer offered him the job. The question is is he employable based upon his condition and even Grzyk said that he's limited to entry level or unskilled jobs and listed 15 examples of those jobs. So your argument about whether the employer did or did not offer him a job is a great argument vis-a-vis the question of maintenance and TTD and probably penalties and attorney's fees but it has absolutely nothing to do with the question of visa permanent total under an odd lot theory. Where is evidence that he cannot work period based upon his age, his condition, his background. This man he has a bachelor's degree from Illinois State University. This is not somebody who is merely an unskilled laborer. I agree with that your honor. My client underwent uh he conducted his self he he's been an iron his whole life. He normally gets his jobs through the hall. He began his self-directed job search on February 1st of 2013. It was self-directed. It wasn't a perfect job search. Even Dr. Grislow testified to that that initially the jobs he was applying for weren't necessarily ones he was going to get. They might have been beyond his ability but eventually he settled into applying for the types of jobs that Dr. Grezik said he should be able to get. He did that self-directed job search for over three and three quarters years and was not able to find a job and we have vocational testimony from Dr. Grezik um and from Mr. Kayan that a self-directed job search was appropriate under national T and Dr. Grezik stated that Mr. Markowitz performed a diligent but unsuccessful job search. So he met that aspect of his burden to show the odd lot entitlement that he had done a diligent but unsuccessful job search. Well let me ask you a question. If the evidence of the case establishes that a claimant does a diligent but unsuccessful job search but also indicates that he's capable of employment and there is employment in the labor market, is he an odd lot? I believe he is because the question isn't the availability necessarily per se. The question is the availability to this gentleman and to this gentleman who applied for all of these various jobs and there are numerous jobs that are outlined in his job logs. He was doing about 15 to 25 contacts per week. He got no offers of employment and there was no possible so for Mr. Markowitz there was no work available to him based on his age, education, work experience, and physical limitations by virtue of the fact that it was an unsuccessful job search. Well but that's not my question. I'm sorry. A person who is fully capable of working and there are jobs within his physical capability is not odd lot merely because he conducted an unsuccessful job search. Especially when your own expert says that at the entire beginning of this thing this guy was applying for jobs that were totally outside of his area of expertise. Your own expert says the beginning of this guy's job search was useless. Well it may have been useless. Well I don't think it was useless. I disagree. The fact that it was unsuccessful initially and ill-conceived doesn't make it useless. He learned from those mistakes and changed course. As a matter of fact, even Dr. Grezik said that he changed course relatively quickly within a matter of a few months. I'll give you Grezik's exact quote. He began his job search. He was looking at the high end quote. Not so much looking for a job but contracting employers that were advertising jobs that were outside of his area. That's what Grezik said word for word. Well the only jobs in his area were iron worker. He's only been an iron worker his entire career. So by definition everything is going to be outside his area. What about this bachelor's degree that he has from Illinois State University? Well you know at some point the bachelor's degree loses its magic when he's been working as an iron worker for as long as he has. All of these arguments that you're making can be made pro and can be made con. It was the commission's determination as to whether this man was on the question of maintenance in TTD and whether the employer actually offered a bona fide job once they were in possession of the doctor's letter. Okay thank you. With respect to once Dr. Grizzolo issued his report which was on January 17th of 2013. He reviewed the job offer at his position. He said his restrictions became even more stringent and more particular because he had read the job description and specifically addressed some of the things that my client would need to be doing and determined that he was physically incapable of performing that job. Then on January 24th we sent Dr. Grizzolo's report to the employer and indicated that our client could not sign the job certification that they asked him to sign and accept the job. And what I'm referring to there is in the job description that he was given he was asked to sign a statement that said I Craig Markowitz have read and understood the essential requirements of this job. I represent that I can safely and effectively perform all essential job functions. Well he couldn't sign that because his own physician stated that he's unable to do that job and the job on its face exceeded the restrictions of his functional capacity evaluation and Dr. Grizzolo's restrictions. So the award that the commission entered of temporary total disability benefits was through the date that he saw Dr. Grizzolo. Why they terminated it on that date I'm not sure. Other than the fact that they appeared to be unhappy with Dr. Grizzolo's they felt that Dr. Grizzolo should have taken into account the fact that the employer was going to modify the job. Well Dr. Grizzolo did take that into account because during his deposition at the very end on redirect he stated he would not release his patient to return to work based on what he could only do occasionally versus frequently. So the award of temporary total disability benefits should be through January 31st of 2013 which is essentially the day before he began the self-directed job search. The commission took away the entire award of maintenance benefits despite the fact that my client underwent the mega driving school from September 5th of 2013 through June 3rd of 2014. He complied with the request of the employer. He was paid benefits for that day. It's it's a patently unfair approach to then turn around and say now you have to pay back the employer all of those benefits they paid you while you were going through their chosen vocational program at their request. Can I ask you a question? Yes. Other than Khan's opinion is there any evidence in this record that supports the conclusion that the claimant was capable of performing the tasks outlined in McHugh's modified job description report? No. There was there were two medical opinions that came into play. One was Dr. Grizzolo. I won't go further into that. The other was Dr. Ram Irabindi their independent medical examiner. Dr. Irabindi saw Mr. Markowitz only three months after Dr. Grizzolo and stated that he was in the medium capacity, no climbing, no ladders, no kneeling, no squatting and not capable of returning to work as an iron worker. However, Dr. Irabindi was never asked to comment on the modified job offer whether or not Mr. Markowitz was capable of performing it. That's not in the record. So the only medical opinions concerning this modified job offer. Let me stop you there. Irabindi did find that this man could not perform certain functions, kneeling, squatting, climbing ladders, etc. and so on. Aren't those functions contained within the modified job description? Would he not have to perform those functions? Well, I don't know that the words were necessarily specifically used, but the description of what he needed to do certainly required him to squat, to kneel, to climb, to effectively be on a ladder since he'd be working off the rungs of rebar with his feet hanging off. So I would argue yes, but not as specifically as perhaps you're saying. I have a question that I have for you is ask for Khan's opinion. Didn't Khan deny ever seen Griswold's progress note of January 17, 2020? He did. And he also said he never reviewed the job and you'll have time and reply. Thank you. Okay. Mr. Berry, you may respond. Thank you, your honors. May it please the court, Mr. Popelka. There's a couple of things that I feel like I need to respond to. But initially, what I want to make sure that I highlight before I miss it or before there's any questions is that there's an argument that your review of this case should be de novo. My understanding of all of the case law is that you're de novo. Mr. Berry, don't spend a lot of time on that. I didn't plan on it. It's a manifest. Okay. As long as the court agrees with that, that I won't waste time. If the facts were all agreed for it to be a de novo review, I don't even think we'd be here. Excuse me. I do have an observation. Okay. You know, you've got to be aware that Supreme Court rule 341 is applicable to Appellees as well as Appellants. In your 17-page argument, there's three citations to the record and only two citations to the arbitrator's decision supporting the factual assertions, which required us to go through 3,000 pages of record to figure out whether what you were telling us was actually contained in the record. Now, I think you've got to accept the proposition that the five judges of this panel are not clerks employed by your law firm. You're supposed to follow the rules. You know, somebody wrote this brief and they left it to us to glean through 3,000 pages of record to figure out what you're telling us is true. Well, go ahead with your argument. I apologize for that, Your Honor. My impression was that I was responding to counsel's arguments, but I apologize for that, Your Honor. I'll do better next time. So, setting aside the fact that there's not a de novo review and this is a manifest weight argument, I think the major component of this that makes everyone have to guess and that has get in front of this esteemed court and continue to climb the ladder is the fact that it seems to continue to be ignored that Mr. Markowitz just simply didn't go back to work when there was an offer. There's all these arguments that he wouldn't have been able to do this and wouldn't have been able to do this and couldn't do this part of the job and couldn't do this part of the job. None of that, we wouldn't have to speculate on any of that stuff if he just went in and tried to do the job. Where is the evidence in this record that this man could physically perform the job that you offered based upon the modified job description and his physician's opinion that he couldn't do it? The offer itself. The offer itself, when the modified job description is, you told him what he'd have to do. Now, if you accept his physician's opinion, he couldn't work for you at all. He couldn't do anything that was required of an iron worker. You weren't going to give him a job as a secretary, were you? Judge, they were going to accommodate him for all of the restrictions that his doctor had given him. They were going to modify the job. I don't want to start to try and get into ADA issues and things like that, but they agreed they would modify the job and they would work within all of the restrictions that he had. Of course, it was going to be adjusted day to day. He needed to come in and try. That was the first offer. The modified job description came out. Mr. Popelka asked you and his doctor takes a look at it and says he can't do any of that, period. If he can't do anything that's in the job description that you offered, what is it that he's supposed to do? Let's be honest, Your Honor. You've seen all of the job description and all of the effort that he made or the lack of effort that he made and everything. This gentleman wasn't coming back to work anywhere. He didn't want to come back to work. He wasn't coming back to work as an iron worker. You're right. The only evidence that you have in the record that suggests that this was a valid job offer is Kahn. Kahn never read the job description. Kahn never even read the man's doctor's report. I don't know what a value Kahn is. Eramundi said he can't kneel. He can't squat. He can't do this. He can't do that. The evidence is all of the things within your job description required him to do those things. I'm at a loss to understand how the commission came up with the conclusion that this man was offered a bona fide job. Well, because they were forced to guess on what exactly the accommodation would have ultimately been because the guy didn't go try. That's what they had to do. They had to deal with guessing because the claimant did not try to go back to work when he was offered a valid job. If they're going to argue it's a sham job, well, then we get back to manifest weight, your honor, and with respect, it's manifest weight. There's evidence that supports the decision. I would suggest he would have been in a much better position if after his doctor had issued the opinion saying he couldn't do any of the things in your job offer, you would send him another letter to tell him what you were going to let him do that did fit within those restrictions, but you didn't do it. Sadly, your honor, I wasn't involved with the case at that point or they might have had better advice on actually detailing that more appropriately. But again, I get back to my point, your honor, of at some point there's responsibilities on both sides. His responsibility was to try, just try. And you can see from all the other stuff in the record, it's not hard to imply that he wasn't really going to make an effort. He wanted to do what he wants to do. You've brought up the fact that he had a degree. He had all kinds of other things. He wanted to do what he wanted to do. He didn't want to do what anyone else wanted him to do. I'm not raising these issues vis-a-vis permanent total disability. I'm raising these issues vis-a-vis TTD maintenance. And although Mr. Popelka didn't get to it, we have to get to it. At what point in time were you aware that this man could not perform under the job description that you'd given him? And therefore, the interesting question comes up, how does that impact on penalties and fees? Well, there's the problem, your honor. At what time are we aware that he can't do it? Well, hell, we don't know that yet because he didn't try. If he'd have tried, we might have been aware at some point, but he didn't try. Also, you knew from the instant you received that note from his doctor, he could not perform under your modified job description. Couldn't do that. I don't believe that's true, your honor. Oh, come on. The doctor couldn't have been more clear. He can't do this. Go on. The problem, Judge, being that McHugh has a lot of people who are working on accommodation right now. The problem is the only way I can prove that is if he goes back and tries. Now, look, he would have a slam dunk argument. And frankly, he might be impermeable total if he went back and tried and said two days in, I couldn't do this and that. And counsels brought up a dozen different things that he wouldn't have been able to do. But there's nothing in the record that says that was actually what he was going to have to do. They said in their offer, they were accommodating it to make sure they didn't violate his restrictions. They did better than half of the job offers that I've seen where they said, if you are violating it, here's not one person to tell. Here's two to tell that you can't do these sort of duties and everything. I believe they did what they needed to do to make him the offer. And then it's a matter of someone has to come in and actually make the effort so that they can accommodate to this. At some point, if someone refuses to be accommodated, refuses to look for jobs that are within their capabilities, refuses to consider the fact that they have other qualifications, no one can control that except for the claimant. No one can. I'm going to read you one phrase from Dr. Griswold's report, which you've got because Mr. Popelka sent it to you. I therefore don't think that he can do the modified job description as described by me and brought to my viewing. I think that he can find vocational retraining, but returning to an iron worker, even on a modified level, would not be possible with his restrictions with regards to his left knee. Now that's pretty clear. He couldn't do your modified job. Although he said based on what he knew, the doctor said based on what he knew. Again, we run into the problem of the guy didn't go try. And that's the huge gorilla in the room, Judge, is if he went and tried and they said, you can't do this and can't do this. And here's the things that we're going to modify. Look, none of these things are a black and white issue. This is an issue of they have to have someone in there to try and figure out what they can and can't do. And if the person doesn't come in and try, what can the respondent do? They can't send the sheriff to drag him in and say, you have to now be on the side. And here's the things that we can do. He has some obligation to actually show up and try. Where is that? You're saying that repeatedly? Where is that found? When there's in the event, and I'm not going to say one way or the other in this case, but where there's a clear description of his limitations, and those limitations negate what is offered as an accommodation. Yeah, I will admit, Your Honor, it's not a clear description. It just says, we won't make him work outside of the restrictions of the doctor. It's not delineated as no standing, no walking. I don't find that in the record. It simply says, we're not going to violate his restrictions. It is a pretty broad discussion. Now, would it have gotten better? I can't predict that. If it would have gotten better when they brought him in and said, okay, here's the final job that we're going to have you doing. All I can do is tell you, McHugh has people working modified work. Now, were those jobs, the jobs that those people came in and started the day they started modified work? I, in the cases that I've had, absolutely not, because they adjust the modification to make sure they can have people working. So it's, it's incredibly difficult for the respondent to be able to sit down and say, here's the exact specific six dozen things that this gentleman would have to do when he doesn't come in and try so they can actually get a feel for what his actual capabilities are, other than a doctor saying, well, based on what I know, this is what he can't do. So again, it sort of puts the respondent in a position of, they can only do what they can do. And then it really lays on the petitioner to actually make an effort. I have a second, second question. Admittedly, you said you didn't handle and advise your client at this stage of the proceedings. Okay. What obligation does your client have? I know, hypothetically, to respond to Mr. Propelco's request to give me a specific delineation of what you're going to ask this person to do. And I will tell you, Judge, that's, I actually think if I'd have been handled in this case, we probably would have paid even less TTD, because I probably wouldn't have done the, I probably wouldn't have done the truck driving and everything else. And it would have been way back because I wouldn't have been, I wouldn't have have dug the heels in that they did about not just giving a job description, that that timeframe where they didn't give the job description where they end up paying TTD, I probably wouldn't have done that, because I don't see the point of what I consider. And again, I'm not saying my client did it wrong, but in my view, that's a petty fight. Why not just say, here's the job description, here's what I would do. So I agree with you on that, Judge. I don't think, I think that was a silly fight and I wouldn't have had that fight if it was me. I would have said, here's the job duties and here's the stuff and come in and we'll modify further as soon as we figure out what exactly your capabilities are. So I agree with you, Judge. And I will tell you, if it wasn't for that, I would be arguing that they awarded even still too much TTD, but it's hard for me to, that's why there's no cross appeal. I can't come in and say no more TTD. And they actually gave even more than they should have because, because my client dug their heels in on what I consider to be something that I wouldn't have really, I would have done it differently for sure. Fair enough. Thank you. And I think is that this is just going into the intersection. Okay. Okay. Well, and realistically, I think I've covered everything. I think I would just make the one other point of, I think the commission got it right when they modified the award, because like I said, even though he did go do the truck driving school and they tried all these other things and everything, I think that really is more of a view of the respondent actually trying to work with him. Cause I don't think they had to do any of that stuff when he decided not to come in and do that job offer that I understand Justice Hoffman's questions about those things and everything. But when he didn't do that, I had just stopped. And instead, I think it's a clear picture of what the respondent was trying to do and trying to work with him, but they then sent him to truck driving school and did other things instead of just saying the heck with it, sir, you don't want to try this. You're done. We're not going to let you do this. You have to guess because he didn't try. I think that should guide your, your guess a little bit on that. The respondent was trying here. They did something that I don't think they had to do. They let him go to truck driving school. They paid him and they did all these different things. And then they got to the end of that. And it's clear again, he only wanted to do what he wanted to do. He didn't want to just get a job and do something. And, you know, I'm sorry, that's how the system works, but at some point either you go and you find what you and you do it on your own and do everything else, or you're stuck with what you're stuck with, or you don't try at all. And then you're, you're sort of, if you don't want to take the responsibility of doing what you need to do, well, then you're stuck with the award that you get from the commission. And this is a manifest weight case. I think there's plenty of evidence to support the decision and it really should be summarily affirmed. Thank you. Okay. Thank you, uh, apparent on both sides. My client did not have the obligation to try to do a job that his physician said he should not try. However, the employer, their front office had the functional capacity evaluation before it provided the job description to my client. And they couldn't even come close to matching a job close to his district restrictions. And then counsel says they would adjust it on the fly. They're not in lower Wacker drive from at the front office to adjust it. Who knows who's going to be out on the job of foreman, a general foreman, who's there for the first time for the first day. He's not going to know my client's restrictions. It's a recipe for failure. And here's how they set them up. The offer of employment states that the job title is ironworker right off the bat. It's confusing. Ironworker is very heavy. He's injured performing work outside the medical modifications. Further benefits may be denied and you may be suspended or terminated. He's being set up for failure there. Let me ask a question because you're going to run out of time real fast. Yes. And we haven't covered it. The basis for denying penalties in attorney's fees was the, the fact that the I guess that he'd been offered a bona fide job off, but no one ever commented on the question of Dr. Arabindi's report that the left knee of which he suffered was the result of some type of underlying chronic degenerative arthritic changes and not the result of a work injury. So my question is to you, the commission never, never ruled on that question because they thought the bona fide job offer disposed of everything. But if McHugh relied on Arabindi's report and justifiably relied upon it, then in that particular case, uh, would penalties or attorney's fees be warranted? Well, Dr. Arabindi in his deposition testified, uh, quite clearly to a chain of events analysis that, um, was left off of his report. And that chain of event analysis was my client was able to do all aspects of the job before the injury. He had the injury following the injury. There was no longer able to perform the job is essential to being an ironworker. So I would say no. Plus, obviously it's up to the employer to ask Dr. Arabindi, can he do this modified job offer? They chose not to do that possibly because they suspected they knew what he would say, or maybe that discussion was had. I really don't know, but I don't think the commission found this with a bona fide job offer. They just, their real finding was that my client had the opportunity. That's not my question. Assuming we were to find that there was no bona fide job offer and the commissioner was wrong in finding that there was, what about Arabindi's, uh, report that specifically says that his knee injury was not the result of a work injury, but rather chronic arthritic changes. How does that affect the question of fees and penalties? Well, that opinion, that opinion wasn't adopted by the commission because the commission awarded. No, no, we know what they didn't even mention. Right. Well, the question is if we were to agree with you and suggest that there was no bona fide job offer and that couldn't be the basis for the denial of penalties or fees, the commission would still have to make a determination as to whether they had a bona fide good faith reason for not paying these benefits because of Arabindi's no causation report. I mean, they have to decide it. Somebody has to decide this. If you're, if you're suggesting that it should be remanded for a determination with that, I would disagree with that because, because they make the decision. Pardon? How can we make the decision by not addressing it? They are making the determination that it was not significant enough to factor into their determination on causation. Why would they, why would they have to, once they have found that there was a bona fide job offer that he didn't accept, they wouldn't have to go one inch further than that to deny penalties and interest. It wouldn't have had a client. There was no reason for them to discuss it. Once they came to that conclusion. So what you're suggesting is that they have to determine, they have to look at Dr. Arabindi's report, which came three months later and determine whether there was an adequate basis there to determine. Well, I think on the record, it's pretty clear. Dr. Arabindi says, regardless of causation, he can't return back to ironwork. The job offer was to return to work as an ironworker. So I don't think that needs to be addressed necessarily because on its face, the job offer is inconsistent with Dr. Arabindi's finding that he can't return back to ironwork. Well, you, but, but that presupposes that every time an employer makes a mistake and fails to pay benefits, that that necessarily means that the claimant is entitled to penalties and interest. There could be a wrong, but yet not frivolous or vexatious reason for not paying. And my question is what is Arabindi's report due to the equation? Well, I don't think it changes anything because we've already got Dr. Grislow saying that he can't return to ironwork and Dr. Arabindi is agreeing with that. So we have that in place before the job offer is even made. And then I'd just like to really quickly add that on the odd lot issue, you know, there are three ways to prove up an odd lot. And I know you were talking about age education. Your time is up a while back here. Thank you. Okay. Thank you. Council both for your arguments in this matter.